[L.A. No. 30558. Sept. 2, 1976.]

BUSINESS TITLE CORPORATION, Plaintiff, v.
DIVISION OF LABOR LAW ENFORCEMENT et al.,
Defendants and Appellants;
UNITED STATES OF AMERICA, Defendant and Respondent.

**COUNSEL**

Lipsig, Rosenfield, Temkin & Leff, Robert G. Leff, Denison & Kight-linger, John P. Kightlinger, Evelle J. Younger, Attorney General, Thomas Scheerer and Martin Milas, Deputy Attorneys General, and Lazar, Friedman, Stahl & Jabin for Defendants and Appellants.

Edward H. Levi, United States Attorney General, Scott P. Crampton, Assistant Attorney General, Gilbert E. Andrews, Crombie J. D. Garrett, Stephen M. Gelber, William D. Keller, United States Attorney, and Charles H. Magnuson, Assistant United States Attorney, for Defendant and Respondent.

Coulter, Vernoff & Brewer and George P. Coulter as Amici Curiae.

## OPINION

SULLIVAN, J.—In this interpleader action brought by an escrow holder to resolve conflicting claims to proceeds of the sale of a liquor license, various wage claimant creditors of the seller appeal from the judgment entered in favor of defendant United States of America for unpaid taxes and penalties.

On September 24, 1971, the District Director of Internal Revenue made an assessment against Mating Game, Inc. for unpaid federal withholding and Federal Insurance Contributions Act (F.I.C.A.) taxes together with penalties and interest in the total amount of $3,170.88. Notice and demand for payment of this assessment was made at the same time.

On October 6, 1971, Mating Game, Inc. entered into a written escrow agreement with 12319 Corporation to sell to the latter for the sum of $10,500 its on sale general liquor license issued for certain premises in Los Angeles. Plaintiff in interpleader, Business Title Corporation (Business Title) acted as escrow holder under this agreement. The full purchase price was deposited in the escrow by the buyer.

During the course of the escrow various creditors of Mating Game, Inc. notified plaintiff escrow holder of unpaid claims. On October 21, 1971, the Internal Revenue Service filed with the Recorder of Los Angeles County notice of its lien for the assessed taxes and on January 5, 1972, served on the escrow holder notice of levy pursuant to this perfected lien for $3,170.88 in previously assessed taxes, penalties and interest. Defendant Division of Labor Law Enforcement, State of California, presented a wage claim in the sum of $1,418.85; defendant Los Angeles Hotel-Restaurant Employer Union Welfare Fund presented

a wage claim for $1,650; and defendants William H. Temkin, Jr., Sanford Orling and Peter Rooney presented similar claims for $3,952.19, $575, and $575 respectively.

Business Title as escrow holder determined that the $10,500 was insufficient to satisfy all of the above claims and the amount due under the federal tax lien. Pursuant to section 24049 of the Business and Professions Code[1] and in order to make actual transfer of the liquor license possible, the escrow holder made payments from this fund to the State Board of Equalization and the Department of Human Resources Development to satisfy outstanding tax liabilities of the State of California. On May 24, 1972, Business Title received notice from the Department of Alcoholic Beverage Control (Department) that the liquor license had been transferred. Accordingly pursuant to section 24074.1[2] it advised each creditor who had filed a claim against the escrow that there were insufficient assets in the escrow to pay all creditors in full.

On July 25, 1972, Business Title brought the instant action in interpleader asking the court to require the claimant defendants to litigate among themselves their respective rights to the funds in escrow

[1]Section 24049 provides: "The department may refuse to transfer any license when the applicant is delinquent in the payment of any taxes due under the Alcoholic Beverage Tax Law, the Sales and Use Tax Law, the Personal Income Tax Law, or the Bank and Corporation Tax Law, or on unsecured property as defined in Section 134 of the Revenue and Taxation Code, when such tax liability arises in full or in part out of the exercise of the privilege of an alcoholic beverage license, or any amount due under the Unemployment Insurance Code when such liability arises out of the conduct of a business licensed by the Department of Alcoholic Beverage Control."

Hereafter, unless otherwise noted, all section references shall be to the Business and Professions Code.

[2]Section 24074.1 provides: "Any person desiring to act as an escrow holder under Section 24074 shall:

"1. Comply with all the applicable provisions of Chapter 1 (commencing with Section 17000) of Division 6 of the Financial Code.

"2. Not more than 10 days after receiving a claim from a creditor, said escrow holder shall acknowledge receipt of each claim; and

"3. Not more than 10 days after the license has been transferred and prior to the distribution of the assets held by said escrow holder he shall advise each creditor who filed a claim against the escrow whether or not there are sufficient assets in the escrow to pay all creditors in full. If the assets in the escrow are sufficient to pay all creditors in full, said escrow holder shall also advise each creditor of the date on or before which payment will be made. If there are not sufficient assets to pay all creditors in full, he shall then advise each creditor who filed a claim of the following: (a) the total assets placed in escrow with him and the nature of each asset; (b) the name of each creditor who filed a claim against the escrow and the amount of said claim; (c) the amount he proposes to pay each creditor; and (d) the date on or before which said amount will be paid to the creditors."

since the total of the claims filed exceeded the sum held in escrow. Each of the defendants answered. Plaintiff escrow holder was ordered to deposit with the court the sum of $7,699.04, the amount remaining in its hands after payment of the above-mentioned state taxes and of the attorney's fees and costs incurred by it and allowed by the court. Upon making such deposit Business Title was discharged from the action. Defendant Mating Game was also dismissed from the action pursuant to a default entered on May 16, 1973. Defendant United States of America (United States), which pursuant to stipulation had been substituted as defendant in place of the originally named United States Department of the Treasury—Internal Revenue Service, moved for partial summary judgment and defendants Temkin, Orling and Rooney also moved for summary judgment.

The trial court filed findings of fact and conclusions of law[3] in which it found the facts to be substantially as we have set them forth. From these findings it concluded that the title to the interpleaded sum of $7,699.04 was in the defaulting defendant Mating Game, that the supremacy clause of the United States Constitution (art. VI, cl. 2)[4] made the priorities accorded defendant United States under sections 6321 and 6323 (a) of title 26, United States Code, control over any priority scheme contained in section 24074 of the Business and Professions Code and that the claim of defendant United States constituted a priority lien claim for unpaid taxes, interest and penalties upon the sum interpleaded and deposited in court and was entitled to be paid from the fund before the claims of the other defendants. Judgment was entered accordingly.[5]

---

[3]Findings of fact "have no place in summary judgment procedure which seeks to discover whether there is anything to try and is concerned with 'issue finding' not 'issue determination.' " (*de Echeguren* v. *de Echeguren* (1962) 210 Cal.App.2d 141, 148 [26 Cal.Rptr. 562].) However, in the case at bench, after the summary judgment motion was filed, the interpleaded defendants filed a stipulation of facts, and thereby, at least implicitly agreed to a trial on the facts stipulated rather than by summary judgment. (See 4 Witkin, Cal. Procedure (2d ed.) § 38, p. 2704.) Although findings of fact are normally unnecessary where a cause is tried on stipulated facts, it is proper for the court to make findings of fact where the stipulated facts contain evidentiary material. (*Hugo Neu Corp.* v. *County of Los Angeles* (1966) 241 Cal.App.2d 703, 706 [50 Cal.Rptr. 916].) Moreover, the parties do not dispute the facts, limiting their appeal to issues of law.

[4]Article VI, clause 2, of the United States Constitution provides:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any thing in the Constitution or Laws of any State to the Contrary notwithstanding."

[5]The judgment directed the clerk of the court to pay out of the fund deposited in court by plaintiff the following: To defendant United States, the sum of $3,520.54 with interest

These appeals by the several defendants (except defendant United States) followed.

Section 24074[6] prescribes certain procedures and requirements in connection with the transfer of a liquor license: The establishment of an escrow, the deposit of the purchase price therein, and the payment from the purchase price of all bona fide creditors who file claims with the escrow holder. If the purchase price or consideration is not sufficient to pay the claims in full, then the escrow holder is to distribute the consideration, so far as is here material, as follows: First to the payment

as specified; to defendant Division of Labor Law Enforcement, 17.36 percent, to defendants Temkin, Orling and Rooney collectively, 62.45 percent, and to defendant Los Angeles Hotel-Restaurant Employer Union Welfare Fund, 20.19 percent, of the fund remaining after payment of the claim of defendant United States.

[6]Section 24074 provides: "Before the filing of such a transfer application with the department, if the intended transfer of the business or license involves a purchase price or consideration, the licensee and the intended transferee shall establish an escrow with some person, corporation, or association not a party to the transfer acting as escrow holder, and the intended transferee shall deposit with the escrow holder the full amount of the purchase price or consideration. The transfer application shall be accompanied by a description of the entire consideration. Such description shall include a designation of cash, checks, promissory notes, and tangible and intangible property, and the amount of each thereof. The licensee and intended transferee shall also enter into an agreement, which agreement shall be deposited with the escrow holder, directing the escrow holder, after the requirements for transfer as provided in Section 24049 are satisfied, to pay out of the purchase price or consideration, the claims of the bona fide creditors of the licensee who file their claims with the escrow holder before the escrow holder is notified by the department of its approval of the transfer of the license or if the purchase price or consideration is not sufficient to pay the claims in full, to distribute the consideration as follows:

"First, to the payment of claims for wages, salaries, or fringe benefits of employees of the seller or transferor earned or accruing prior to the sale, transfer, or opening of an escrow for the sale thereof;

"Second, to the payment of claims of secured creditors to the extent of the proceeds which arise from the sale of the security;

"Third, to the United States for claims based on income or withholding taxes; and thereafter for claims based on any tax other than taxes specified in Section 24049;

"Fourth, to the payment of claims on mechanics' liens;

"Fifth, to the payment of escrow fees and the payment of claims for prevailing brokerage fees for services rendered and claims for reasonable attorney's fees for services rendered.

"Sixth, to the payment of claims for goods sold and delivered to the transferor for resale at his licensed premises and the payment of claims for services rendered, performed, or supplied in connection with the operation of the licensed business.

"Seventh, to the payment of all other claims. The payment of these claims if sufficient assets are not available for the payment of the claim in full shall be paid pro rata.

"If the transferor licensee disputes any claim the escrow holder shall notify the claimant and the amount or pro rata amount thereof shall be retained by the escrow holder for a period of 25 days, and if not attached shall be paid to the transferor licensee. The agreement shall also provide that the escrow holder shall make the payment or distribution within a reasonable time after the completion of the transfer of the license."

of claims for wages, salary, or fringe benefits of employees of the seller; second to the payment of claims of secured creditors; and "Third, to the United States for claims based on income or withholding taxes." Thus, the statutory language would appear to give priority to defendants' wage and salary claims over defendant United States' claim for unpaid taxes.

However, this conferral of priority is illusory and dissolves before the paramount commands of federal law. ■ It is now well settled and indeed beyond argument that federal law rather than state law determines the priority of competing liens where one of them is a tax lien asserted by the United States.[7] (*Aquilino* v. *United States* (1960) 363 U.S. 509, 513-514 [4 L.Ed.2d 1365, 1368-1369, 80 S.Ct. 1277]; *United States* v. *Acri* (1955) 348 U.S. 211, 213 [99 L.Ed. 264, 267, 75 S.Ct. 239]; *U. S.* v. *Security Tr. & Sav. Bk.* (1940) 340 U.S. 47, 49-50 [95 L.Ed. 53, 56-57, 71 S.Ct. 111]; *United States* v. *Trigg* (8th Cir. 1972) 465 F.2d 1264, 1269.) In *Acri* the high court observed that the "relative priority of the lien of the United States for unpaid taxes is . . . always a federal question to be determined finally by the federal courts. The state's characterization of its liens, while good for all state purposes, does not necessarily bind this Court." (348 U.S. at p. 213 [99 L.Ed. at p. 267].) In the case at bench, as the trial court properly determined, defendant United States acquired pursuant to 26 United States Code section 6321,[8] a lien "in favor of the United States upon all property and rights to property, whether real or personal, belonging to . . ." Mating Game. This lien arose on September 24, 1971, the date of the assessment (26 U.S.C. § 6322) and was perfected

---

[7]Defendants contest the applicability of this rule to the sale of alcoholic beverage licenses on the ground that section 24074 was enacted pursuant to the Twenty-first Amendment to the United States Constitution and therefore is not subject to the supremacy clause. However, the Twenty-first Amendment does not supersede all other provisions of the Constitution with respect to liquor regulation (*California* v. *LaRue* (1972) 409 U.S. 109, 115 [34 L.Ed.2d 342, 350, 93 S.Ct. 390]) and is aimed specifically at exempting the states from "traditional Commerce Clause limitations when it restricts the importation of intoxicants destined for use, distribution, or consumption within its borders." (*Hostetter* v. *Idlewild Liquor Corp.* (1964) 377 U.S. 324, 330 [12 L.Ed.2d 350, 355, 84 S.Ct. 1293].) Whenever the Twenty-first Amendment and other portions of the United States Constitution are in potential conflict, the conflict is resolved as follows: "Like other provisions of the Constitution, each must be considered in the light of the other, and in the context of the issues and interests at stake in any concrete case." (*Id.,* at p. 332.) Section 24074 merely provides a scheme of priorities among private creditors of liquor licensees that in no way relates to the state's interest in regulating the consumption and distribution of alcohol.

[8]Section 6321 provides: "If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."

by filing notice of lien with the Recorder of Los Angeles County. (26 U.S.C. § 6323 (f).) Under 26 United States Code section 6323[9] the lien was superior to all unperfected claims and all later perfected claims, such as those of defendants.

On the other hand, state law, not federal law, determines whether the taxpayer has "property and rights to property" (26 U.S.C. § 6321; see fn. 8, *ante*) to which the federal lien can attach. (*Aquilino* v. *United States, supra,* 363 U.S. 509, 513 [4 L.Ed.2d 1365, 1368].) Therefore, "[t]he threshold question in this case, as in all cases where the Federal Government asserts its tax lien, is whether and to what extent the taxpayer had 'property' or 'rights to property' to which the tax lien could attach. In answering that question, both federal and state courts must look to state law, for it has long been the rule that 'in the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property . . . sought to be reached by the statute.' . . . However, once the tax lien has attached to the taxpayer's state-created interests, we enter the province of federal law, which we have consistently held determines the priority of competing liens asserted against the taxpayer's 'property' or 'rights to property.' " (*Aquilino, supra,* at pp. 512-514 [4 L.Ed.2d at pp. 1368-1369]; *United States* v. *Bess* (1958) 357 U.S. 51, 55 [2 L.Ed.2d 1135, 1140-1141, 78 S.Ct. 1054]; *Avco Delta Corporation Canada Ltd.* v. *United States* (7th Cir. 1973) 484 F.2d 692, 697.)

Thus, the question presented to us in the instant case narrows to whether Mating Game according to California law had "property" or "rights to property" in the funds held by the escrow agent to which the lien of defendant United States could attach. Defendant wage claimants contend that Mating Game was not entitled to the proceeds of the sale held in escrow until the liquor license was transferred, that the liquor license could not be transferred until all the bona fide creditors were paid in accordance with section 24074 and therefore that Mating Game had no "property" or "rights to property" until the prior claims specified by section 24074 were paid.

Defendants rely heavily on the case of *United States* v. *State of California* (9th Cir. 1960) 281 F.2d 726, which arose out of bankruptcy

---

[9]Section 6323 (a) provides: "The lien imposed by section 6321 shall not be valid as against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary or his delegate."

proceedings. There, a California liquor licensee was delinquent in payment of federal taxes. The United States, pursuant to a warrant of distraint, seized his business property, including the license certificate. The licensee was adjudicated bankrupt and the United States surrendered the certificate to the receiver in bankruptcy. The license which had meanwhile been renewed was sold at auction by the receiver to certain purchasers, subject to the approval of the Department of Alcoholic Beverage Control. The Department withheld its approval of the transfer of the license until delinquent state sales and use taxes and unemployment contributions were paid from the purchase price pursuant to section 24049. (See fn. 1, *ante.*) Upon payment thereof, the transfer was approved and a certificate was issued to the purchasers. As a result, the United States received a substantially lesser amount from the proceeds of the sale.

The United States sued the State of California to recover the amount the state had retained in delinquent taxes contending that to permit California to retain such sums would be to defeat the paramount right of the federal government to levy and collect taxes and to render the United States' tax claim subordinate to that of the state. The Ninth Circuit Court of Appeals held that there was no property to which the lien could attach until the Department approved the transfer, that such approval was conditioned upon the prior payment of state taxes, and therefore that there was no property to which the lien could attach until after such taxes had been paid. The court declared: "The question, however, is not as to the supremacy of the tax lien of the United States. The question is as to the nature of the 'property and right to property' (26 U.S.C. § 6321) to which that lien attached. Ordinarily, in determining this question we look to state law. . . . [¶] Here the license existed because the state had issued it. If the licensee acquired something of value, it was because the state had bestowed it upon him. Whatever value the license, as property, may have had to a purchaser depended upon its transferability. If it was transferable, it was because the state had made it so. If the state had seen fit to impose conditions upon issuance or upon transfer of property it has wholly created, that is the state's prerogative so long as its demands are not arbitrary or discriminatory. The federal government has no power to command the state in this area. It has no power to direct that property be created by the state for purposes of federal seizure." (*Id.,* at pp. 727-728.)

The United States argues that the case at bench is distinguishable because section 24049 (see fn. 1, *ante*)—the section applicable in the last cited case—confers upon the Department the power to refuse absolutely

the transfer of a liquor license if the licensee is delinquent in paying state taxes whereas section 24074 (see fn. 6, *ante*)—the section applicable in the instant action—merely directs the priority in which the proceeds derived from the transfer (after approval by the Department) shall be distributed. To put the argument another way: Section 24049 gives the Department the power to refuse to transfer any liquor license, and thereby to make available to creditors the proceeds of its sale, until the delinquent state taxes specified in the section have been paid. Section 24074 on the other hand confers no power to defeat the transfer of the license as is shown by section 24074.1 (see fn. 2, *ante*) which provides that within 10 days after the license has been transferred with the approval of the department, the escrow holder shall notify the creditors of the distribution of the assets held by the escrow holder. If such assets are insufficient to pay all creditors in full the escrow holder shall advise each creditor who filed a claim of the following: (a) The total assets placed in escrow with him and the nature of each asset; (b) the name of each creditor who filed a claim against the escrow and the amount of said claim; (c) the amount he proposes to pay each creditor; and (d) the day of payment. (§ 24074.1; see fn. 2, *ante.*)

It is thus clear that the priorities set forth in section 24074 are not conditions to the approval of the transfer by the Department, that section 24074 does not confer upon the Department the power to refuse the transfer unless the priorities are complied with, but that instead it sets forth the priorities for disbursement of the funds belonging to the seller *after* the transfer has been approved by the Department in accordance with the prescribed escrow.[10] (See *Doyle* v. *Coughlin* (1974) 37 Cal.App.3d 911, 917-918 [112 Cal.Rptr. 701].) Once the transfer has been approved, as occurred in this case on May 24, 1972, prior to the close of escrow, title to the proceeds passed to Mating Game subject to the lien priorities and Mating Game held property in the escrow to which the federal tax lien could attach.

This conclusion is entirely consistent with prior California law on the subject. (*Gough* v. *Finale* (1974) 39 Cal.App.3d 777 [114 Cal.Rptr. 562];

---

[10]Moreover, even if section 24074 purported to condition the property rights, it is doubtful that a state is empowered to modify property rights and concepts in order to effect a state-desired scheme of lien priorities in derogation of federal law. "The language alone of our statute is not dispositive of the issue, for a state legislative pronouncement in and of itself is insufficient to determine the existence or nonexistence of a property interest within the meaning of section 6321 [26 U.S.C.] . . . . [¶] Thus, as far as the federal government is concerned, N.J.S.A. 33:1-26 cannot immunize liquor licenses from the attachment of federal liens. . . ." (*The Boss Co., Inc.* v. *Bd. of Com'rs of Atlantic City* (1963) 40 N.J. 379, 383, 387 [192 A.2d 584].)

*Doyle* v. *Coughlin, supra,* 37 Cal.App.3d 911, 917-918; *Golden* v. *State* (1955) 133 Cal.App.2d 640 [285 P.2d 49].) In *Golden* the court held that the liquor license and the proceeds derived from its transfer while reposing in escrow were "property" and "rights to property" within the meaning of 26 United States Code section 3670 (now 26 U.S.C. § 6321), that the federal tax lien attached to such property and acquired priority under federal law, section 24074 notwithstanding. Defendant wage claimants[11] urge that since section 24074 as it read at that time[11] merely directed the escrow holder to distribute the sale proceeds pro rata to timely filing creditors, the court recognized that the statute was not intended to give the creditors priority over the prior government tax lien (*id.,* at p. 646). They further argue that since section 24074 now specifically asserts priorities for state wage claims over and above federal tax liens, *Golden* no longer has vitality. However, the court in *Golden* did not limit itself to a question of statutory interpretation, but specifically indicated that the state was incompetent to set up such priorities in derogation of federal claims (see fn. 10, *ante*) because the liquor license and proceeds of sale thereof were property to which the lien attached and under settled law once the lien attaches federal law governs the priority of tax liens.

Moreover, the court in *Gough* v. *Finale, supra,* 39 Cal.App.3d 777, interpreted the effect of section 24074 as it presently reads with the asserted order of priorities and held that where the scheme for payment of creditors of a bankrupt vendor of a liquor license under section 24074 conflicts with the priorities specified in the Federal Bankruptcy Act, the

---

[11]Former section 7.2 of the Alcoholic Beverage Control Act (Deering's General Laws, Act 3796), predecessor statute to section 24074, provided: "At least seven days before the filing of a transfer application with the board the licensee and the intended transferee shall establish an escrow with some person, corporation or association, not a party to the transfer, acting as escrow holder, and said intended transferee shall deposit with said escrow holder the full amount of the purchase price or consideration, if any there be, to be paid in connection with said transfer, and said licensee and intended transferee shall also enter into an agreement, which agreement shall be deposited with said escrow holder, directing said escrow holder, out of said purchase price or consideration, to pay the claims of such of the bona fide creditors of the licensee as shall file their said claims with said escrow holder within said period of seven days after the recording of the notice provided for in Subdivision 1 of this section or if such purchase price or consideration shall not be sufficient to pay said claims in full, to distribute said consideration pro rata to said creditors of said licensee; said agreement shall also provide that said escrow holder shall make such payment or distribution within a reasonable time after the completion of the transfer of said license. A certified copy of the recorded notice of intended transfer and a copy of said escrow agreement certified by the escrow holder to be a true and correct copy thereof shall be filed with the board together with any transfer application." (Stats. 1941, ch. 1189, p. 2960.)

Federal Bankruptcy Act controls. The court distinguished the case of *United States* v. *State of California, supra,* 281 F.2d 726, on the ground that section 24049 affected rights reserved by the creator of the property right whereas section 24074 attempts to grant priority rights to a certain class of private creditors of a license holder. As pointed out earlier in this opinion, we distinguish this case on a different basis in the tax lien context as opposed to the bankruptcy context: section 24074 does not confer upon the Department the power to refuse to transfer the license, thereby conditioning the very creation of the proceeds from a transfer, but merely attempts to establish priorities among creditors following transfer. Nonetheless the result in *Gough* as in *Golden* is entirely consistent with our conclusion that the proceeds in escrow following approval of the transfer by the Department belong to the vendor licensee subject to the lien claims priority as established by federal law, when one of the claims is a federal tax lien. The court in *Doyle* v. *Coughlin, supra,* 37 Cal.App.3d 911, 917-918, specifically held that title to the escrow fund is transferred upon the transfer of the liquor license by the Department and that upon such transfer the seller owns the proceeds of the sale subject to the claims of the seller's creditors who filed their claims with the escrow holder before the latter was notified by the Department of its approval of the transfer of the license.

The trial court properly determined that the claim of defendant United States constituted a priority lien claim for unpaid taxes, interest and penalties upon the sum deposited in court by plaintiff and that such claim was entitled to be paid from such fund before the claims of the other defendants.

The judgment is affirmed.

Wright, C. J., McComb, J., Tobriner, J., Clark, J., and Richardson, J., concurred.

**MOSK, J.**—I dissent.

The problem here is not the conferral of a priority, or the effect of competing liens on property. If it were, unquestionably federal claims would be paramount. The fundamental issue is whether, when the property would not exist except for its creation by the state, the federal government can prevent the state from determining the nature and value of the property which it creates.

The United States relies upon 26 United States Code section 6321, which provides, in relevant part, for a tax lien "upon all property and rights to property, whether real or personal, *belonging to such person.*" (Italics added.) Thus in determining the validity of the government's lien we must initially ascertain whether there was any property and rights to property belonging to the persons indebted to the government, and if so, the nature and value thereof. In so doing we look exclusively to state law; it has been held that the federal code section creates no property rights but merely attaches federally defined consequences to property rights which are defined by state law. (*Ideco Division of Dresser Indus.* v. *Chance Drilling Co.* (5th Cir. 1970) 422 F.2d 165; *United States* v. *Gurley* (5th Cir. 1969) 415 F.2d 144.)

Superficially a liquor license is merely a tangible sheet of paper, worth a farthing. Whatever additional value there may be inherent in its possession or transfer is artificially created by the State of California. Its worth is determined not by intrinsic merit, not by supply and demand, not by the tests of market value, not by any other principles of economics, but exclusively by the monetary and possessory limits prescribed by the regulating authority, the state. If the state were to prohibit the transfer of liquor licenses, which it could do under its police power, there would be no property or rights to property in the instant case and thus the government could impose no lien. By parity of reasoning, when the state permits a transfer only upon satisfaction of precise statutory conditions, which are admittedly not unreasonable, the property and rights to property exist subject to those conditions.

The rule was well-stated in *United States* v. *State of California* (9th Cir. 1960) 281 F.2d 726, 728: "Here the license existed because the state had issued it. If the licensee acquired something of value, it was because the state had bestowed it upon him. Whatever value the license, as property, may have had to a purchaser depended upon its transferability. If it was transferable, it was because the state had made it so. If the state had seen fit to impose conditions upon issuance or upon transfer of property it has wholly created, that is the state's prerogative so long as its demands are not arbitrary or discriminatory. The federal government has no power to command the state in this area. It has no power to direct that property be created by the state for purposes of federal seizure.

"The United States contends that the state has no right to impose such a condition against the claims of the United States; that a state's control over the issuance of liquor licenses is derived from its police power; that

the conditions here imposed by the state relate to revenue and not to police control.

"Assuming, arguendo, that conditional demands of a state, unrelated to the privilege sought to be transferred, would be regarded as arbitrary, we cannot say that such is the case here. If (as here) the conditions be lawful in the sense that they are proper and reasonable demands to make of an applicant, they constitute a limitation upon the right of the applicant and upon the property which that right constitutes and upon the values which attach to that property. Those values and no greater values became a part of the bankrupt estate and fell within the reach of the United States."

I turn, then, to determine the nature and extent of the property interest created by the State of California. It seems evident that as to the escrow funds to which the wage earners have a valid claim, there is no property or rights to property "belonging to such person" indebted to the government, as required by 26 United States Code section 6321. The wage earners are not indebted to the government and property belonging to them is not subject to a tax lien.

But, the majority argue, the state statutory conditions apply to the disbursement of funds in escrow as distinguished from the transfer of the license. There are, they hold, two distinct processes. However, such attempted fragmentation of what is essentially a unitary transfer scheme is utterly unrealistic.

The Legislature has made it abundantly clear that the escrow is an integral part of the transfer process. Entering into escrow is not a voluntary act; the statute directs that it *shall* be established (§ 24074). Sections in the Business and Professions Code relating to the entire subject (transferability, § 24070; transfer fees, § 24072; notice of intended transfer of licenses, § 24073; escrow, § 24074; duties of escrow holder, § 24074.1) are all included in the same article of the code (ch. 6, art. 5). That they are interrelated and inseverable is indicated by section 24074.3, which requires the prospective transferee to file with the department a statement that the consideration has been deposited—not with the proposed transferor—but with the escrow holder.

The statutes thus contemplate that transfer is totally dependent upon payment of funds or other consideration to the escrow holder, and the duties of the escrow holder require compliance with section 24074.1

before a transfer may be consummated and property or a property right created. If the escrow holder fails to complete his statutory duty the attempted transfer fails.

A reading of section 24074.4 confirms this interpretation. In lieu of opening an escrow a corporate licensee may file with the department a guarantee that all creditors of the licensee shall be faithfully paid, and the "department shall not transfer the license until the guarantor has paid all the creditors' claims in full." The section, while not apposite to the instant case, is illustrative of the legislative intent to make inseverable the relationship between transfer of the license and satisfaction of creditors' claims, in this instance through an escrow.

In the final analysis, as the Attorney General points out in his amicus curiae brief, a matter of important public policy is involved here. The Legislature in section 24074 recognized the preferred position of wage earners who have not been paid for their labor, and thus imposed payment to them as a condition precedent to the creation of a property interest in the escrow funds. It is clear that state law determines whether there exists a property interest to which a federal lien can attach. (*Aquilino* v. *United States* (1960) 363 U.S. 509, 512-513 [4 L.Ed.2d 1365, 1368-1369, 80 S.Ct. 1277]; *United States* v. *Bess* (1958) 357 U.S. 51, 55 [2 L.Ed.2d 1135, 1140-1141, 78 S.Ct. 1054]; *Avco Delta Corporation Canada Ltd.* v. *United States* (7th Cir. 1973) 484 F.2d 692, 697, cert. den. 415 U.S. 931 [39 L.Ed.2d 490, 94 S.Ct. 1444].) Under the circumstances in this case the relevant funds in escrow belong to the wage claimants. They are not property, belonging to persons indebted to the government, to which a federal tax lien may attach.

I would reverse the judgment.