[L.A. No. 30907. July 20, 1978.]

BUSINESS TITLE CORPORATION, Plaintiff and Respondent, v.
UNITED STATES OF AMERICA, Defendant and Appellant;
LOS ANGELES HOTEL-RESTAURANT EMPLOYER-UNION
WELFARE FUND, Defendant and Respondent.

COUNSEL

Andrea Sheridan Ordin, William D. Keller and Robert L. Brosio, United States Attorneys, Charles H. Magnuson, Assistant United States Attorney, Myron C. Baum, Acting Assistant Attorney General, M. Carr Ferguson, Assistant Attorney General, Gilbert E. Andrews, Crombie J. D. Garrett and Stephen M. Gelber for Defendant and Appellant.

Coulter, Vernoff & Brewer and George P. Coulter for Plaintiff and Respondent.

Denison & Kightlinger and Michael L. Taylor for Defendant and Respondent.

**OPINION**

MANUEL, J.—Here, as in the recent case of *Business Title Corp.* v. *Division of Labor Law Enforcement* (1976) 17 Cal.3d 878 [132 Cal.Rptr. 454, 553 P.2d 614], we confront an appeal from a judgment in an action in interpleader brought by an escrow holder who, acting pursuant to an appointment under the provisions of section 24074 of the Business and Professions Code,[1] seeks to resolve conflicting claims to the proceeds from the sale of a liquor license. Also as in the former case, one of the parties claiming an interest in the proceeds is the United States of America (United States), seeking to enforce a federal tax lien arising out of an assessment against the seller of the liquor license. Here, however, it is the United States which appeals from an adverse judgment below. For reasons to be fully set forth we have concluded that certain crucial differences exist between the former *Business Title* case and that now before us, and that those differences require a result contrary to that urged by the United States. Accordingly, we affirm the judgment.

The facts are not in dispute. Hall-Thomas, Inc., entered into an agreement to sell its cocktail lounge business, including the on-sale general liquor license, to Frank and Genevieve Musica. On December 10, 1971, preparatory to filing an application for transfer of the license with the Department of Alcoholic Beverage Control (department) (see §§ 24070-24073), the parties, pursuant to the provisions of section 24074,[2]

---

[1]Hereafter, unless otherwise noted, all section references shall be to the Business and Professions Code.

[2]At the time here in question section 24074 provided: "Before the filing of such a transfer application with the department, if the intended transfer of the business or license involves a purchase price or consideration, the licensee and the intended transferee shall establish an escrow with some person, corporation, or association not a party to the transfer acting as escrow holder, and the intended transferee shall deposit with the escrow holder the full amount of the purchase price or consideration. The transfer application shall be accompanied by a description of the entire consideration. Such description shall include a designation of cash, checks, promissory notes, and tangible and intangible property, and the amount of each thereof. The licensee and intended transferee shall also enter into an agreement, which agreement shall be deposited with the escrow holder, directing the escrow holder, after the requirements for transfer as provided in Section 24049 are satisfied, to pay out of the purchase price or consideration, the claims of the bona fide creditors of the licensee who file their claims with the escrow holder before the escrow holder is notified by the department of its approval of the transfer of the license or if the purchase price or consideration is not sufficient to pay the claims in full, to distribute the consideration as follows:

"First, To the payment of claims for wages, salaries, or fringe benefits of employees of the seller or transferor earned or accruing within ninety (90) days prior to the sale, transfer, or opening of an escrow for the sale thereof;

"Second, To the payment of claims of secured creditors to the extent of the proceeds which arise from the sale of the security;

established an escrow with Business Title Corporation as escrow holder. Under the terms of the escrow instructions the total price (not including broker's commission) was $63,000, of which $3,000 was to cover merchandise and inventory. Payment was to be made $10,000 in cash, approximately $14,000 through the assumption by buyers of an unpaid obligation of sellers, and the balance through a note secured by a junior security in fixtures and equipment. Escrow was to close "upon transfer of the liquor license to buyer by [department]." The instructions specifically provided that upon approval of the transfer the escrow holder was to distribute the proceeds out of the escrow in accordance with the provisions of section 24074.

After the opening of the escrow and the deposit of the necessary cash and documents therein by buyer notice to creditors was duly recorded and published. (See Cal. U. Com. Code §§ 6105, 6107.)

On January 31, 1972, the escrow instructions were amended to reflect that the seller, Hall-Thomas, Inc., had assigned the buyer's note and security interest to Credit Managers of Southern California (Credit Managers) as trustee for the seller's then unsecured creditors, and the escrow holder was instructed to remit these documents to the assignee at the close of escrow "together with residue of cash proceeds accruing to selling corporation, of [sic] any. . . ."

Pursuant to the aforesaid notice to creditors several claims were timely received in the escrow, including one by defendant Los Angeles Hotel-Restaurant Employer-Union Welfare Fund (Welfare Fund) in the

---

"Third, To the United States for claims based on income or withholding taxes; and thereafter for claims based on any tax other than taxes specified in Section 24049;

"Fourth, To the payment of claims on mechanics' liens;

"Fifth, To the payment of escrow fees and the payment of claims for prevailing brokerage fees for services rendered and claims for reasonable attorney's fees for services rendered;

"Sixth, To the payment of claims for goods sold and delivered to the transferor for resale at his licensed premises and the payment of claims for services rendered, performed, or supplied in connection with the operation of the licensed business.

"Seventh, To the payment of all other claims. The payment of these claims if sufficient assets are not available for the payment of the claim in full shall be paid pro rata.

"If the transferor licensee disputes any claim, the escrow holder shall notify the claimant, and the amount or pro rata amount thereof shall be retained by the escrow holder for a period of 25 days, and if not attached shall be paid to the transferor licensee. The agreement shall also provide that the escrow holder shall make the payment or distribution within a reasonable time after the completion of the transfer of the license." (Stats. 1970, ch. 492, § 1, pp. 973-974.)

The statute was further amended in 1972 (Stats. 1972, ch. 1000, § 1, pp. 1826-1829) and in 1977 (Stats. 1977, ch. 266, § 1, p. —). (See fn. 12, post.)

amount of approximately $10,000 for unpaid employer contributions for employee benefits. None of the claims was disputed by Hall-Thomas (see § 24074, final par.; fn. 2, *ante*).

On February 7, 1972, after the payment of applicable state taxes (see § 24049), the escrow holder received notice that transfer of the liquor license from Hall-Thomas to the Musicas had been approved. On February 17, pursuant to the relevant provisions of section 24074.1,[3] notice was mailed to all creditors who had filed claims prior to transfer[4] indicating the amount to be paid to each.[5] Before delivery and disbursement of the property in escrow, however, it appears that the licensed premises were wholly destroyed by fire. When the buyers refused to make further payments on the deferred portion of the purchase price pending resolution of ensuing controversies between the parties to the escrow and their insurers, litigation was commenced. The escrow holder was thereupon requested to defer further action pending the outcome of this litigation.

[3]Section 24074.1 provides: "Any person desiring to act as an escrow holder under Section 24074 shall: . . .

" . . . . . . . . . . . .

"3. Not more than 10 days after the license has been transferred and prior to the distribution of the assets held by said escrow holder he shall advise each creditor who filed a claim against the escrow whether or not there are sufficient assets in the escrow to pay all creditors in full. If the assets in the escrow are sufficient to pay all creditors in full, said escrow holder shall also advise each creditor of the date on or before which payment will be made. If there are not sufficient assets to pay all creditors in full, he shall then advise each creditor who filed a claim of the following: (a) the total assets placed in escrow with him and the nature of each asset; (b) the name of each creditor who filed a claim against the escrow and the amount of said claim; (c) the amount he proposes to pay each creditor; and (d) the date on or before which said amount will be paid to the creditors."

[4]It appears that department's approval of a transfer and the transfer itself are considered to be one and the same thing.

[5]The record does not contain a copy of the notice sent and thus we cannot be sure of its exact contents in this case. In a declaration attached to the escrow holder's application for an order discharging it from the interpleader action it is stated that the notice "show[ed] distribution of the *cash* consideration on deposit with the escrow holder [which the complaint indicated amounted to $8,651.25, at the time of filing, certain proper administrative costs and expenses as well as the aforesaid payment of state taxes having been disbursed out of the escrow] pursuant to the system of priorities established by Business and Professions Code Section 24074." (Italics added.) It appears therefore that distribution of only the *cash* consideration in escrow was contemplated.

In 1977, section 24074 was amended to state that the escrow holder should be directed, after transfer of the license "to pay out of the purchase price or consideration, *whether such consideration takes the form of cash, checks, promissory notes, or tangible or intangible property,* the claims of the bona fide creditors. . . ." (Italics added.)

For reasons to appear below, none of the parties challenges the judgment herein other than as it determines the distribution of cash.

On April 3 and April 27, 1972, after the occurrence of these events, federal tax assessments were made against the seller, Hall-Thomas, Inc., for unpaid withholding and payroll taxes in an amount over $19,000.[6] Notice of liens relating to these assessments (see 26 U.S.C. § 6321) was served on the escrow holder and filed in the offices of the county recorder and the Secretary of State.

Following the termination of the aforementioned litigation the instant action in interpleader was filed by the escrow holder on July 10, 1975, the plaintiff requesting that it be discharged from liability and dismissed from the action upon depositing the interpleaded property with the court, and that it be awarded costs of suit and attorney's fees incurred in the action pursuant to the provisions of Code of Civil Procedure section 386.6.[7] Named as parties defendant were the United States, Welfare Fund, Credit Managers, and several other parties including the buyer and seller. However, all named defendants except the United States and Welfare Fund filed disclaimers of interest in the interpleaded property.[8] Each of the latter defendants claimed "first priority" to the funds on deposit in escrow (see fn. 5, *ante*), the United States on the ground that sections 6321 to 6323 of the Internal Revenue Code of 1954 (26 U.S.C. §§ 6321-6323) accorded its tax liens priority over both the Welfare Fund's claim and the escrow holder-interpleader's claim for attorney's fees and costs,[9] and the Welfare Fund on the basis of the priorities set forth in section 24074 (see fn. 2, *ante*). It was argued by the interpleader and the Welfare Fund that because the transfer of the subject license had taken

[6]It appears that some portion of this tax has now been paid. The United States indicates in its briefs as of April 22, 1977, the total amount of tax outstanding was $4,618.09 plus interest and penalties.

[7]Section 386.6 provides as here relevant that a plaintiff in interpleader may in his complaint request "allowance of his costs and reasonable attorney fees incurred in such action. In ordering the discharge of such party, the court may, in its discretion, award such party his costs and reasonable attorney fees from the amount in dispute which has been deposited with the court."

[8]The interpleaded property consisted of cash in the sum of $8,651.25 (see fn. 5, *ante*) together with the buyers' demand promissory note in the original principal sum of $62,000 and security agreement, the buyers' assumption agreement relating to seller's unpaid obligation of approximately $14,000, and seller's assignment of the buyers' note and security agreement to Credit Managers. However, the aforementioned fire had apparently rendered the security valueless and the escrow holder requested the filing of disclaimers by the secured parties. In late July and early August 1975, such disclaimers of interest in "the money and/or property in dispute" were filed with the court by Credit Managers, Hall-Thomas, the Musicas, and First United Thrift and Loan, holder of the senior security interest under the assumed note (fixtures and equipment).

[9]Section 6321 provides: "If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto)

place prior to the federal assessments, and because the seller no longer had any "property" or "rights to property" in the proceeds derived from the transfer at the time the federal lien arose, the lien did not attach to such proceeds.

At the conclusion of trial the court, apparently at the request of counsel for the United States, deferred closing argument and judgment until the decision of this court in *Business Title Corp.* v. *Division of Labor Law Enforcement, supra,* 17 Cal.3d 878 (hereafter referred to as *Business Title I*) was rendered. Upon the finality of that decision argument was heard and the case submitted.

The trial court agreed with the position taken by the Welfare Fund. In its findings of fact and conclusions of law, filed simultaneously with the judgment on October 28, 1976, it found and concluded "That at the time of the United States of America's assessment and later filing of notice of tax lien, there was no property or rights to property belonging to the delinquent taxpayer herein to which the United States of America's lien could attach then being held by the plaintiff interpleader escrow company."[10] Judgment was entered discharging and dismissing the interpleader, awarding it out of the interpleaded fund the sum of $1,471 for attorney's fees and costs incurred in the action, and awarding the residue of the cash proceeds to the Welfare Fund.[11] The United States appeals from the judgment.

---

shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."

Section 6322 provides that the aforesaid lien "shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed (or a judgment against the taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason of lapse of time."

Section 6323, a comprehensive statute dealing with validity and priority of the lien, provides in subdivision (a) that the lien "shall not be valid as against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary or his delegate." In *Business Title Corp.* v. *Division of Labor Law Enforcement, supra,* 17 Cal.3d 878, 885, we stated that under this section "the lien was superior to all unperfected claims and all later perfected claims. . . ."

[10]The trial court also found and concluded that the interpleaded property had been "properly assigned pursuant to an assignment for the benefit of creditors upon the close of escrow herein prior to any assessment or filing of any notice of claim or lien of the United States of America." It is clear, however, and no longer the subject of dispute before us, that the assignment to Credit Managers can have no effect on the proper determination of the rights here in question. Not only did the assignment cover merely the "residue" of the cash proceeds here in issue (see fn. 5, *ante*), but the disclaimer of interest filed by the assignee with the court precluded all claims by it (see fn. 8, *ante,* and accompanying text).

[11]The judgment also ordered that certain documents be delivered to the clerk of the court for cancellation; these included the Musica note and security agreement, the

The argument of the United States may be briefly summarized. The instant case, it is urged, is wholly controlled by our decision in *Business Title I* and the principles upon which it was based. There, the government asserts, we held that upon the transfer of a liquor license in escrow the proceeds become the property of the seller, and that as long as such proceeds "repose in escrow" (see 17 Cal.3d at p. 888) prior to actual distribution they remain subject to the attachment of a federal tax lien. The fact that the lien here in question arose subsequent to transfer—whereas in the former case it arose prior to transfer and, indeed, prior to the opening of escrow—is urged to be wholly without significance. The important fact, the United States urges, is that the lien arose while the proceeds were still "reposing in escrow" prior to actual distribution. The state scheme of "priorities" set forth in section 24074, in the government's view, can no more effect the operation of these principles in the instant case than it could effect their operation in the situation involved in *Business Title I.*

It is quite true that in *Business Title I* we indicated that section 24074, unlike section 24049, "confers no power to defeat the transfer of the license" but rather "merely directs the priority in which the proceeds derived from the transfer (after approval by the Department) shall be distributed." (17 Cal.3d at p. 887.) Accordingly, we suggested that section 24074 had no effect on the property rights arising on transfer—and that even if it purported to have such an effect its efficacy for this purpose would be open to question in light of the requirements of federal law in light of the supremacy clause of the United States Constitution. (*Id.,* at p. 887, fn. 10.) Thus, in summarizing our conclusion we stated: "[T]he proceeds in escrow following approval of the transfer by the Department belong to the vendor licensee subject to the lien claims priority as established by federal law, *when one of the claims is a federal tax lien.*" (*Id.,* at p. 889; italics added.) We have no occasion in the instant case to reexamine these determinations, and we decline to do so.[12] We do have occasion, however, to address the question of their application in the circumstances of the instant case, which differ markedly from those in *Business Title I* in the aspect indicated by the language from that case which is italicized immediately above.

---

assumption agreement, and the seller's assignment for the benefit of unsecured creditors. (See fn. 8, *ante.*) As indicated above, this aspect of the judgment is not here in dispute.

[12]We believe that such a reexamination would be particularly inappropriate in view of the fact that section 24074 was amended in 1977 to grant first priority to federal tax claims, moving wage claims and claims of secured creditors to second and third priorities respectively. (Cf. fn. 2, *ante.*)

In *Business Title I* the federal tax lien arose and was perfected prior to the date of the transfer of the license.[13] Although observing that "federal law rather than state law determines the priority of competing liens where one of them is a tax lien asserted by the United States [citations]" (17 Cal.3d at p. 884; fn. omitted), we concluded that " '[t]he threshold question in this case, as in all cases where the Federal Government asserts its tax lien, is whether and to what extent the taxpayer had "property" or "rights to property" to which the tax lien could attach.' " (*Id.,* at p. 885, quoting from *Aquilino* v. *United States* (1960) 363 U.S. 509, 512 [4 L.Ed.2d 1365, 1368, 80 S.Ct. 1277].) This question, we held—following clear federal authority—was a matter of state, not federal law. In view of the circumstances there before us we determined that the taxpayer-seller, at the point when the federal lien arose (i.e., before transfer) still retained "property" or "rights to property" in the license to which the federal lien could attach. (See also *Golden* v. *State of California, supra,* 133 Cal.App.2d 640, 642-645.) Upon transfer of the license, and the passage of title therein to the buyer, the lien attached to the proceeds derived therefrom, and at that point, we held, the matter of priority to such proceeds became a matter of federal law, according to which the federal lien was paramount.

██ In the instant case, on the other hand, the facts are quite different. Here the escrow had been opened, notice to creditors had been recorded and published, all claims had been received (none of which was disputed by the taxpayer-seller), requisite state taxes had been paid, transfer of the license had occurred, and notice to claimant creditors of the amount proposed to be paid to each (§ 24071.1) had been sent—*all before the federal assessments had occurred and the federal lien had been perfected.* It appears likely, in fact, that but for the fire on the licensed premises and the request for delay in distribution which flowed therefrom (see text following fn. 5, *ante*) the proceeds would have been disbursed in accordance with the section 24074.1 notice before the federal assessment took place. In these circumstances we believe that a result different from that reached in *Business Title I* must follow.

██ Here the federal tax lien had not come into existence at the time of the transfer of the subject liquor license following department approval. It is therefore clear that from that moment forward the

---

[13]In *Business Title I* the Internal Revenue Service served a notice of levy pursuant to its perfected lien with the section 24074 escrow holder prior to transfer. This, however, was not necessary to the efficacy of the lien. (See *Golden* v. *State of California* (1955) 133 Cal.App.2d 640, 648 [285 P.2d 49].)

taxpayer-seller had no "property" or "rights to property" in the license to which the federal lien could attach. (Cf. *Doyle* v. *Coughlin* (1974) 37 Cal.App.3d 911, 915-918 [112 Cal.Rptr. 701].)[14] It is equally clear for this reason that the federal lien, not having attached to the seller's property interests in the license, was not at the moment of transfer eligible to participate in the distribution of the proceeds. Here the distinction between this case and *Business Title I* assumes particular significance. In that case, where the federal tax lien was among the claims in existence at the moment of transfer, the following principle, already quoted above, was held to control: "[T]he proceeds in escrow following approval of the transfer by the Department belong to the vendor licensee subject to the lien claims priority as established by federal law, *when one of the claims is a federal tax lien.*" (17 Cal.3d at p. 889, italics added.) The same principle cannot, however, control here, for the federal tax lien had not even come into existence at the time of transfer.[15]

In spite of the foregoing, however, it is manifest that when the federal lien *did* come into existence it attached to whatever "property" or "rights to property" that the seller retained in the yet-undistributed proceeds,

---

[14]In the *Doyle* case the federal government sought to assert its lien for unpaid tax liabilities of *buyer* against proceeds of the sale of a liquor license which were "reposing" in a section 24074 escrow subsequent to transfer of the license. The lien, however, had arisen subsequent to transfer. The Court of Appeal held that at that point the buyer no longer had "property" or "property rights" in the proceeds to which the federal lien could attach. "The creditor protection purposes of section 24074," the court stated, "mandate the conclusion the event necessary to transfer title to the escrow fund from buyer to seller (and to seller's creditors) is the transfer of a liquor license and not, as with the ordinary escrow, the fullfillment of *all* escrow conditions by the parties. Moreover, language from sections 24074 and 24074.1 supports the thesis that transfer of a liquor license is pivotal to transfer of the ownership of the escrow fund. Thus, we note that section 24074 states the escrow 'agreement shall . . . provide that the escrow holder *shall* make the payment or distribution [to seller's creditors] within a reasonable time after the *completion of the transfer of the license.*' Likewise, section 24074.1 requires that '[a]ny person desiring to act as an escrow holder under Section 24074 shall . . . (3) Not more than 10 days *after the license has been transferred* and prior to the distribution of the assets held by said escrow holder . . . advise each creditor who filed a claim against the escrow [as to assets in the escrow fund].' From the above, it is apparent the Legislature intended transfer of a liquor license to change ownership of the section 24074 escrow fund. . . . [¶] The state government, in the instant case, transferred Seller's liquor license to Buyer on September 8, 1967. As of that date, following the mandatory and exclusive provisions of section 24074, we conclude the escrow monies belonged to Seller and his timely filing creditors. Since the United States does not here claim to have been a creditor of *Seller* at the time of the transfer of the license, it must fail in its attempt to establish ownership rights to the escrow balance." (37 Cal.App.3d at pp. 917-918; cf. *Golden* v. *State of California, supra,* 133 Cal.App.2d 640, where the federal lien arose prior to transfer.)

[15]In language immediately following that quoted above, we adverted directly to the holding in *Doyle* v. *Coughlin, supra,* (see fn. 14, *ante*), thus indicating that our concern was with the legal relationships established at the moment of transfer.

and that upon attachment its priority was governed by federal law. The fundamental question in this case, therefore, is whether, at the moment the federal lien came into existence, the seller-taxpayer retained any property or property rights in the proceeds. That question, as we have indicated (see text following fn. 13, *ante*), is to be decided according to state, not federal law. We therefore look to the statutory provisions governing the subject escrow to determine it.

Section 24074 (fn. 2, *ante*) clearly contemplates and provides that the seller has the right to dispute any creditor's claim which is duly filed in the escrow prior to the transfer of the license. If he exercises this right the escrow holder, upon transfer of the license, must so notify the claimant, at which point the latter has the right to file an action at law and, within 25 days, to attach that portion of the proceeds which he claims,[16] at which point it appears to be contemplated that the matter of rights in the property so attached shall be the subject of the legal proceedings outside of escrow. (See *In re Leslie* (9th Cir. 1975) 520 F.2d 761, 763.) If the seller does not, however, exercise his right to dispute one or more of the claims filed prior to transfer, then the escrow holder, within 10 days of transfer, is required to advise the filing creditors of the amount he proposes to pay each (whether it be the full amount claimed or, in the case where insufficient assets remain in the escrow to pay all creditors in full, some pro rata amount) and the date on or before which such payment will be made. (§ 24074.1, subd. 3; fn. 3, *ante*.) Payment or distribution is to be made "within a reasonable time" after transfer. (§ 24074, final par.; fn. 2, *ante*.)

 We reach the following conclusions on the basis of the foregoing statutory scheme: Whatever "property" or "rights to property" the seller may have in the proceeds because of his power to dispute claims of creditors filed prior to transfer,[17] such rights are extinguished when, as here (1) he does not dispute any claim so filed, and (2) the assets remaining in escrow at the time of transfer are insufficient to pay the claims in full. At that point he loses all power to establish a claim to any portion of the proceeds and the matter of distribution becomes wholly one between the creditors and the escrow holder. (See *Cohn* v. *Gramercy Escrow Co.* (1977) 65 Cal.App.3d 884 [135 Cal.Rptr. 688].) For these

---

[16]If attachment does not occur within 25 days of the transfer of the license, the escrow holder is required to pay the disputed amount or a pro rata portion thereof to the seller. (§ 24074, final par.; fn. 2 *ante*.)

[17]Any such right would be in the nature of chose in action. (See Civ. Code, § 14, subd. 3.)

reasons we hold that the trial court properly determined that "at the time of the United States of America's assessment and later filing of notice of tax lien, there was no property or rights to property belonging to the delinquent taxpayer herein to which the United States of America's lien could attach then being held by plaintiff interpleader escrow company."[18]

We are not persuaded that the cases of *Gough* v. *Finale* (1974) 39 Cal.App.3d 777 [114 Cal.Rptr. 562] and *In re Leslie, supra,* 520 F.2d 761 require a different result. In *Gough* it does not appear when the transfer took place, and in *Leslie* it is not indicated whether or not the proceeds were sufficient to pay the claims of all timely filing creditors in the 24074 escrow. In any event we do not believe that principles applicable in the case of a voluntary filing of bankruptcy by the seller-taxpayer are necessarily applicable in cases involving the attachment of a federal tax lien.

The conclusion we have reached—that under state law the seller had no "property" or "rights to property" in the proceeds to which the federal lien could attach when it arose—renders it unnecessary for us to consider the additional contention, raised by the Welfare Fund in its reply to the United States' supplemental brief, that under the federal law of priority the federal lien had it attached to the proceeds, was nevertheless not paramount because the interests of creditors had by that time become "choate" within the meaning of *United States* v. *New Britain* (1954) 347 U.S. 81 [98 L.Ed. 520, 74 S.Ct. 367]. (See generally Plumb, *Federal Liens and Priorities—Agenda for the Next Decade* (1967-1968) 77 Yale L.J. 228, 605, 1104.)

The judgment is affirmed.

Tobriner, J., Clark, J., Richardson, J., and Newman, J., concurred.

---

[18]It is true that we indicated in *Business Title I* that upon transfer, title to the proceeds passed to the *seller* "subject to the lien priorities . . . ." (17 Cal.3d 878, 887; see and cf. *Doyle* v. *Coughlin, supra,* 37 Cal.App.3d 911, 918 ("to Seller and his timely filing creditors").) In that case, however, as we have pointed out, the federal lien had attached to the seller's "property" or "rights to property" in the license, and upon its transfer passed immediately to the proceeds derived therefrom—its priority in the distribution of such proceeds to be determined by federal law. Here, on the other hand, the lien had not come into existence at the time of transfer and the proceeds passed unencumbered by it. Although technically speaking the proceeds passed to the "Seller and his timely filing creditors" (*Doyle, supra*), such proceeds were insufficient to pay the creditors and the seller relinquished any claim he may have had to them by failing to dispute any such claims. Thus, when the federal lien at last arose, some two months later, the seller no longer had any right in the proceeds to which it could attach.

**MOSK, J.**—I concur in the well-reasoned opinion of the court, and agree that these facts differ from those in *Business Title Corp.* v. *Division of Labor Law Enforcement* (1976) 17 Cal.3d 878 [132 Cal.Rptr. 454, 553 P.2d 614].

If the circumstances had been identical we could have considered overruling *Business Title Corp. I.* The results of that ill-considered opinion have been tragic to working men and women, whose legitimate claims for wages accruing prior to the sale of a business must be subordinated to the demands of the federal government. (*Id.,* at p. 889 (dis. opn. by Mosk, J.).)

*Business Title Corp. I* was a blow to employees and their right to be compensated for services rendered. The error of this court has now been compounded: believing itself bound by our ruling on the law, the Legislature in 1977 amended Business and Professions Code section 24074 so that hereafter in the list of priorities the claims of the federal government statutorily rank ahead of claims for unpaid wages of employees.

Although it is still my opinion that both legally and socially the priorities have been inverted, I must concede that rejection now of our earlier case would amount to little more than locking the barn door *post* horse. Fortunately the court has discovered a factual detour in the instant case.

Bird, C. J., concurred.