[Civ. No. 47343. Second Dist., Div. Five. Jan. 13, 1977.]

ALFRED COHN, Plaintiff and Appellant, v.
GRAMERCY ESCROW COMPANY, Defendant,
Cross-complainant and Appellant;
6236 SANTA MONICA BOULEVARD, INC., et al.,
Cross-defendants and Respondents.

COUNSEL

Gould, Magaram, Riskin, Wayne & Minikes, Ira D. Riskin and Morton Minikes for Plaintiff and Appellant.

Coulter, Vernoff & Brewer and George P. Coulter for Defendant, Cross-complainant and Appellant.

Berchin & Berchin and Jerome J. Berchin for Cross-defendants and Respondents.

OPINION

HASTINGS, J.—On April 2, 1971, an escrow was entered into to transfer a conveyance of an alcoholic beverage license. The seller of the license was 6236 Santa Monica Blvd., Inc. (seller) and Cassjen, Inc. was the buyer (buyer). The escrow company involved was Gramercy Escrow Co. (Gramercy), and its escrow instructions provided that the escrow was to be conducted under the provisions of section 24074 (see fn. 5) of the California Business and Professions Code.[1] The purchase price for the license was $11,500, with $500 to be paid in cash and the balance represented by a promissory note from buyer to seller, payable in installments commencing approximately one year after the close of escrow.

Prior to the date of the license transfer, plaintiff-appellant Alfred Cohn (Cohn) submitted to the escrow a claim in the aggregate sum of $11,302, consisting of $5,702 claimed to be due on fixtures purchased by seller (which fixtures were not transferred to the escrow), and $1,600 as alleged damages for loss of prospective profits under a cigarette machine vending agreement, and $4,000 as alleged damages for loss of prospective profits under another coin-machine agreement, with the proviso that an agreement of the buyer to assume the seller's obligations under the two coin-machine agreements would discharge the claim to that extent.

Notice of transfer of the license from the Department of Alcoholic Beverage Control was received by Gramercy on June 14, 1971. On June 24, Gramercy gave to creditors of seller, whose claims had been received

---

[1]Unless otherwise stated, all code sections refer to the California Business and Professions Code.

in escrow, notice that the cash amount deposited in escrow was insufficient to pay creditors in full, and setting forth the intended distribution of the escrow proceeds on or before July 7, 1971. In substance, this notice stated that Gramercy would distribute the sum of $500 to itself for escrow costs and to various named creditors (Cohn was not named), and would distribute the promissory note to seller.[2] As of that time, the aggregate of claims filed in the escrow amounted to the sum of $57,687.35. On June 29, 1971, the cash proceeds of $500 were distributed to Gramercy ($300), and the balance ($200) was transmitted to the named creditor-claimants on a pro-rata basis of 2.59 percent of the amounts owed. The recipients were trade creditors in the sixth order of priority as established by section 24074. No payments were made to general creditors (which included Cohn) in the seventh and final order of priority as established by that section.[3] The promissory note of $11,000 was at that time transferred to the seller. Immediately thereafter, seller discounted and sold the note. Cohn brought suit against seller and buyer for damages and to set aside the transfer on the theory that it was a fraudulent transaction.[4] Apparently, Cohn was unsuccessful in collecting his claim in that suit because approximately one and one-half years later, he filed his complaint in this action, claiming $11,302 plus interest as compensatory damages and $50,000 punitive damages against Gramercy on a claim of alleged conversion of the deferred promissory note delivered to seller through escrow.

On commencement of the trial, Cohn offered certain documentary evidence, and Gramercy objected to the introduction of any evidence, stating that it intended to move for judgment on the pleadings in that Cohn failed to state a cause of action against Gramercy. The court overruled Gramercy's objection and ordered the documentary materials to be received in evidence at that point. Subsequently, the first witness for Cohn was sworn, and Gramercy again moved for judgment on the

---

[2]The actual notice was: "The On Sale General Liquor License has transferred in the above mentioned escrow, and in accordance with Section 24074.1 of the Business and Professions Code we are informing you of the present status of this escrow.

"We have in escrow $500.00, and an installment note in the amount of $11,000.00 executed by buyer in favor of seller. In accordance with the Code, we propose on or before July 7th, 1971 to distribute the $500.00 to the Creditors as shown below, and turn over the $11,000.00 installment note to the Seller."

[3]Cohn also claimed he was a secured creditor in the second priority. This seems unlikely under the facts; however, we are not ruling on this point and Cohn can again raise this issue without prejudice on retrial.

[4]Cohn had filed a lawsuit by July 15, 1971, against seller and sought to garnish the debt under the note. The garnishment on the buyers was returned saying no monies were due because the note had been quickly discounted.

pleadings. The court, after consideration of the evidence received, the pleadings, and arguments of counsel, granted Gramercy's motion for judgment on the pleadings. Cohn appealed.

Gramercy had cross-complained against seller and buyer for its counsel fees relating to the action and costs incurred. The court, when it granted the judgment in favor of defendant Gramercy, then ordered judgment on the Gramercy cross-complaint against seller for the sum of $1,925, but not against the buyer. Gramercy appeals from that portion of the judgment denying its request for fees and costs from buyer.

### ARGUMENT

Cohn argues that one of the primary objectives of section 24074[5] is to create an escrow fund-creditor protection plan, and that bona fide

---

[5]Section 24074 provides: "Before the filing of such a transfer application with the department, if the intended transfer of the business or license involves a purchase price or consideration, the licensee and the intended transferee shall establish an escrow with some person, corporation, or association not a party to the transfer acting as escrow holder, and the intended transferee shall deposit with the escrow holder the full amount of the purchase price or consideration. The transfer application shall be accompanied by a description of the entire consideration. Such description shall include a designation of cash, checks, promissory notes, and tangible and intangible property, and the amount of each thereof. The licensee and intended transferee shall also enter into an agreement, which agreement shall be deposited with the escrow holder, directing the escrow holder, after the requirements for transfer as provided in Section 24049 are satisfied, to pay out of the purchase price or consideration, the claims of the bona fide creditors of the licensee who file their claims with the escrow holder before the escrow holder is notified by the department of its approval of the transfer of the license or if the purchase price or consideration is not sufficient to pay the claims in full, to distribute the consideration as follows:

"First, to the payment of claims for wages, salaries, or fringe benefits of employees of the seller or transferor earned or accruing prior to the sale, transfer, or opening of an escrow for the sale thereof.

"Second, to the payment of claims of secured creditors to the extent of the proceeds which arise from the sale of the security;

"Third, to the United States for claims based on income or withholding taxes; and thereafter for claims based on any tax other than taxes specified in Section 24049;

"Fourth, to the payment of claims on mechanics' liens;

"Fifth, to the payment of escrow fees and the payment of claims for prevailing brokerage fees for services rendered and claims for reasonable attorney's fees for services rendered.

"Sixth, to the payment of claims for goods sold and delivered to the transferor for resale at his licensed premises and the payment of claims for services rendered, performed, or supplied in connection with the operation of the licensed business.

"Seventh, to the payment of all other claims. The payment of these claims if sufficient assets are not available for the payment of the claim in full shall be paid pro rata.

"If the transferor licensee disputes any claim the escrow holder shall notify the claimant and the amount or pro rata amount thereof shall be retained by the escrow

creditors who timely file their claims in escrow become beneficiaries of the escrow. Accordingly, failure of the escrow holder to protect the interests of creditors of sellers to the escrow fund will subject the escrow holder to liability to the creditors for any loss occasioned by its breach of duty in that respect. Cohn relies on specific language in the section and on *Grover Escrow Corp.* v. *Gole,* 71 Cal.2d 61 [77 Cal.Rptr. 21, 453 P.2d 461], and *Doyle* v. *Coughlin,* 37 Cal.App.3d 911 [112 Cal.Rptr. 701]. The language in the section requires the "intended transferee" (usually a buyer) to deposit with the escrow the full amount of the purchase price or consideration, accompanied by a description of the consideration which includes "a designation of cash, checks, promissory notes, and tangible and intangible property." The escrow instructions between the seller and buyer must contain a provision directing the escrow holder "to pay out of the purchase price or *consideration,* the claims of the bona fide creditors of the licensee . . . or if the purchase price or consideration is not sufficient to pay the claims in full, to distribute the consideration (according to certain designated priorities)."

*Grover Escrow Corp.* v. *Gole, supra,* 71 Cal.2d 61, 64-65, stated that sections 24070 through 24082 provided a comprehensive program to regulate liquor license transfers. Section 24074 was intended to protect not only buyers and sellers of liquor licenses, but also the creditors of sellers, by creating a payment plan dependent upon submission of claims, and not upon the usual commercial self-help procedures of attachments and executions. The court determined that section 24074 supersedes all other remedies against the sale proceeds for creditors of liquor license transfers, and that the provisions of said section are mandatory and not directory. And in *Doyle* v. *Coughlin, supra,* at page 917, the court said: "Protection for creditors of the licensee-seller is achieved by creating a payment plan dependent upon submission of creditor claims *prior* to the date when the escrow holder is notified of the state's approval of the liquor license transfer. Such creditor protection (from the escrow fund) is limited to timely filing creditors. [Citation.] This escrow fund-creditor protection plan is intended (1) to prevent use of a liquor license or its transfer, directly or surreptitiously, as a security device and (2) to eliminate 'races to the courthouse' by those creditors first privy to knowledge of an intended liquor license transfer. [Citation.]" (Italics in original.)

---

holder for a period of 25 days, and if not attached shall be paid to the transferor licensee. The agreement shall also provide that the escrow holder shall make the payment or distribution within a reasonable time after the completion of the transfer of the license."

Cohn contends that all of the assets making up the consideration for the purchase price belong to the escrow fund-creditor protection plan and therefore the escrow holder cannot distribute any part of the consideration to the seller if bona fide creditors who have timely presented their claims are still unpaid. Furthermore, when the asset is impractical to distribute because of its form, i.e., a promissory note, the escrow holder then has the affirmative duty of depositing the subject promissory note into court incident to an interpleader, declaratory relief, or some other appropriate action, so that the court may make an order in connection with that asset which will carry out the purposes and intent of section 24074.

Gramercy makes several arguments; first, that except to the extent provided in the first sentence of the final paragraph of section 24074, that section imposes no direct requirements on escrow holders, but rather requires the transferor and intended transferee to perform certain acts, including the acts of establishing an escrow, and of executing and depositing with the escrow holder an escrow agreement directing it to conduct the escrow in a specified manner. As to distribution of the cash and the promissory note, Gramercy cites section 24074.1.[6]

Gramercy contends it complied with both sections and therefore cannot be held liable to a third party for carrying out its obligations in strict accordance with the instructions which it received from the parties to the escrow.

Gramercy's second argument is that neither the escrow instructions or section 24074 require the escrow holder to accomplish the impossible

---

[6]Section 24074.1 provides as follows: "Any person desiring to act as an escrow holder under Section 24074 shall:

1. Comply with all the applicable provisions of Chapter 1 (commencing with Section 17000) of Division 6 of the Financial Code.

2. Not more than 10 days after receiving a claim from a creditor, said escrow holder shall acknowledge receipt of each claim; and

3. Not more than 10 days after the license has been transferred and prior to the distribution of the assets held by said escrow holder he shall advise each creditor who filed a claim against the escrow whether or not there are sufficient assets in the escrow to pay all creditors in full. If the assets in the escrow are sufficient to pay all creditors in full, said escrow holder shall also advise each creditor of the date on or before which payment will be made. If there are not sufficient assets to pay all creditors in full, he shall then advise each creditor who filed a claim of the following: (a) the total assets placed in escrow with him and the nature of each asset; (b) the name of each creditor who filed a claim against the escrow and the amount of said claim; (c) the amount he proposes to pay each creditor; and (d) the date on or before which said amount will be paid to the creditors."

(i.e., to divide and distribute the non-fungible portion [the promissory note] of the consideration to third parties). Nor do the escrow instructions or section 24074 impose upon the escrow holder any liability to pay out any amounts over and above the funds (cash) subject to its custody and control under the escrow agreement.

Finally, Gramercy asserts Cohn's claim fell in the seventh priority status of section 24074 and that the most he would have received was $793.40 had the total purchase price been paid in cash. Therefore, his claim for damages exceeding $11,000 is unwarranted.

## DISPOSITION

It is indisputable that section 24074 was designed to protect not only the buyer and seller of a liquor license, but creditors of the seller (see *Grover Escrow Corp.* and *Doyle, supra*). It is also irrefragable that the sale transaction here, as carried out by seller, buyer, and Gramercy, whether intentional or not, substantially defrauded creditors in the sixth priority classification, and, to a lesser extent, those in the lowest (seventh) classification. The procedure used to transfer the license and the consideration—under the guise that it was legal under section 24074—is so ingenious that if it is not stopped it could become a commonly used vehicle for subverting the protection intended creditors by the Legislature. The one asset that could have benefited the creditors was dissipated before they could reasonably act.

With these observations in mind, we respond to Gramercy's arguments as follows:

(1) Gramercy states that section 24074 places no mandatory requirements on it (except as provided by the first sentence in the last paragraph),[7] but only requires the seller and buyer to establish the escrow and to then execute an agreement directing the escrow holder to conduct the escrow in a specified manner. If the escrow complies with these instructions (as Gramercy contends it did), it cannot be liable to third parties.

We disagree. The provisions of the section are mandatory and as such are read into all escrow instructions relative to a liquor license. (*Grover*

---

[7]This sentence requires the escrow to hold a claimed creditors share for 25 days if the seller has disputed the claim. (See discussion *infra.*)

*Escrow Corp.* v. *Gole, supra,* 71 Cal.2d 61, and *Doyle* v. *Coughlin, supra,* 37 Cal.App.3d 911.) ■ Clearly, the section is designed to create an escrow fund-creditor protection plan, and it replaces all other procedures that a creditor would normally use against a seller to collect sums due him when seller's liquor license is being sold. (*Grover* and *Doyle, supra.*) When one of the main purposes of an agreement is to benefit third persons, they are entitled to recover as third-party beneficiaries in the event of a breach of that agreement. (*Lucas* v. *Hamm,* 56 Cal.2d 583, 590 [15 Cal.Rptr. 821, 364 P.2d 685].) It follows that bona fide creditors of the licensed seller are in this category and failure to protect their interests to the fund assets will subject the escrow holder to liability to the creditors for any loss occasioned by its breach of duty.

(2) We are not impressed by Gramercy's second argument that it was required to distribute the promissory note to seller because it was not apportionable in kind, and that section 24074 applies only to distribution of cash. The section states that, when a transfer of a liquor license involves a purchase price or consideration, the full amount must be deposited in escrow with a description of the *entire* consideration, including cash, checks, *promissory notes,* and tangible and intangible property. ■ All of the deposited assets, not just cash, are to be distributed in a manner that will benefit creditors covered by the statute. The law, by interpleader and declaratory relief actions, provides practicable methods to resolve distribution problems of promissory notes, tangible and intangible property, if the parties have not provided for a plan or method in the escrow instructions that will protect the bona fide creditors.[8] Gramercy was aware of these procedures. Its own escrow instructions used by the parties in the transaction, in paragraph IV, state: "Should any dispute arise between or among the parties hereto or third parties or should ESCROW HOLDER receive conflicting demands with reference to the escrow, ESCROW HOLDER may, at its option, but without limiting its other rights hereafter set forth, do either of the following:

"(a) Stop all proceedings in the performance of this escrow and withhold delivery of documents or monies in its possession until such dispute or conflicting demands have been resolved and written proof thereof has been deposited in escrow.

"(b) File an interpleader suit in any court of competent jurisdiction. Upon the filing of such suit ESCROW HOLDER shall be fully released and

---

[8]By way of example, see Code of Civil Procedure, sections 386 et seq. and 572 et seq.

discharged of and from all obligations and liability in connection with the escrow, and the parties jointly and severally agree to pay ESCROW HOLDER all costs, expenses, charges and reasonable attorney's fees expended or incurred by ESCROW HOLDER."

Gramercy concludes its second argument by claiming that its compliance with section 24074.1 renders it immune to any liability. The pertinent portion of this section provides: "If there are not sufficient assets to pay all creditors in full, he shall then advise each creditor who filed a claim of the following: (a) the total assets placed in escrow with him and the nature of each asset; (b) the name of each creditor who filed a claim against the escrow and the amount of said claim; (c) the amount he proposes to pay each creditor; and (d) the date on or before which said amount will be paid to the creditors."

■ This notice, however, only requires the escrow holder to notify the creditors of the *amount* it intends to pay them and approximately when. It does not authorize distribution of an asset other than cash to the seller when the bona fide creditors are still not fully paid, and before the creditors can reasonably protect themselves. The last paragraph of section 24074 demonstrates the weakness in Gramercy's argument. A creditor whose claim has been denied or disputed is entitled to 25 days' notice so that he can take legal action to protect his claim until its validity is established. ■ In the present case, no creditors' claims were disputed by the seller; therefore, every creditor had the right to assume his claim would be honored. When the final notice arrived (Friday, June 25, 1971 at the earliest), they learned that the note would be transferred to seller on or before July 7th. Even though the notice said "on or before," the connotation was misleading and most creditors would not have suspected the transfer would take place the following Tuesday, June 29th. Time for them to protest distribution of the promissory note or to take legal action (with a weekend in between) was so minimal that it bordered on the impossible. The point is this: if Gramercy's argument is accepted, the prima facie bona fide creditors under a scheme as practiced here, have less chance to protect their claims than the creditors with questionable claims. Again, we are constrained to state that such a result could not have been intended by the Legislature.

We conclude that Gramercy breached its duty to the bona fide creditors when it distributed the promissory note to seller.

(3) We are not required, nor can we, dispose of Gramercy's last argument that Cohn, if successful, is only entitled to judgment in the amount of $793.40. The trial court, by its premature judgment, did not reach the issues of compensatory and punitive damages. Obviously, many factors are involved before such awards can be determined. They are issues that only a trial court can deal with. Additional evidence is required, along with points and authorities on how such evidence should be applied under the statutes and existing decisional law.

As to Gramercy's appeal on its cross-complaint, the judgment of the trial court regarding attorney's fees must also be reversed. By reason of our opinion, Gramercy's position is considerably changed. On retrial, the court must reconsider the requests for attorney's fees and deny or award them as warranted under the judgment.

The judgments on the complaint and on the cross-complaint are reversed and a new trial, consistent with this opinion, is ordered.

Stephens, Acting P. J., and Ashby, J., concurred.